and the case just argued is submitted. With that, we will proceed to the final case on the argument calendar, Traverse Therapy v. Sadler-Bridges Wellness Group. All right. Counsel, you have 15 minutes each, and whenever you're ready to proceed. Thank you, Your Honor. May it please the Court, I'm Daniel Spurgeon on behalf of Traverse Therapy Services, the plaintiff below and the appellant here. I'd like to reserve... Counsel, if you could maybe speak a little closer to the mic. Thank you. I'd like to reserve 10 minutes for rebuttal, Your Honor. You've got 15 minutes, you're saving 10 of it? Yes, Your Honor. Thank you, Your Honor. This case is a relatively straightforward dispute over trade secrets. Unlike many other cases, the statutes are clear, the case law is clear, the canons of interpretation are clear. Where this case went wrong is the application of those clear standards. The Trade Secrets Act creates no exceptions for medical businesses to be stripped of their protections for their trade secrets. The district court here essentially created an exception that Congress chose not to create, where if the information is protected under HIPAA, it loses its protection under the trade secret statutes, which is not in the text of the statute. It's not recognized in any case law and was clearly an error. Although we're here under a de novo standard, even if it was under an abusive discretion standard of review, that departure from the statutory text would require reversal itself. What efforts did your client undertake to protect what it considers to be trade secrets? Your Honor, we have a secure database called Simple Practice, and only employees who are assigned to treat particular patients have electronic access rights to even know about those particular therapy clients. We introduced the declaration of Mr. Singh and Ms. Southerd. Those declarations spell out the password protection process, the assignment of different email accounts. Ms. Campbell had to access that information while she was employed by your client in order to render services, correct? Yes, Your Honor. Go ahead. I was going to point out, in the deposition testimony of Ms. Campbell, Mr. Bulling Bridges, as cited in our opening brief, they freely admitted the only reason that they had access to these clients' identities, the fact of therapy purchases, was because of their authorized duties as Traverse employees. And it doesn't waive trade secrets protection. While Ms. Campbell was employed by your client, she dealt with individual clients, correct? Yes, Your Honor. And had access to information related to those clients? Yes, Your Honor. After she left, did she attempt to contact any person that was not her client before? Not her client, that we don't know because of the withheld communications. What information is there that she did contact people who were not her client? There's nothing in the record presently that after her departure she was contacting people who were not Traverse clients during her employment. There is evidence in the record that some of those 50 people she sent the email to, while a Traverse employee, using Traverse's password-protected information, that she was not presently treating them as a Traverse employee. She had signed an employment agreement with your client? Yes, Your Honor. Did it say anything about trade secrets? Yes, Your Honor. Did it identify the information you just described as being a trade secret? It doesn't use the term trade secret, but it does refer to confidential information in a way that encompasses client information, patient information, which clearly encompasses the information that we suit upon here. Any separate document signed by Ms. Campbell that acknowledged that this client information was in fact a trade secret? It does in substance, Your Honor, and we have the policies in the record, but it's not a stand-alone trade secrets document. It's a confidentiality and non-disclosure agreement that covers the subject thoroughly. But no separate document in which Ms. Campbell acknowledged at the request of your client that this client information was trade secret? There's no separate stand-alone agreement, to answer your question directly. I will point out that the statutes, both Washington and federal, do not require a contractual commitment. It's one of the many pathways to protection under the statute. However, as long as the person who is acquiring or using the information has reason to know that it is subject to the employer's protective sphere, that is sufficient to protect it and bar any unauthorized use. Did your client engage in consistent enforcement of its understanding of what trade secrets were? Yes, Your Honor. In fact, when Traverse noticed that there was an unusual change in the amount of retained clients in that summer of 2023, they thought someone might be misusing the information. So they in fact sent the warning letter that cited the Trost case and the Washington-Nowagroski case that pointed out, in case this is happening and you're using Traverse's password-protected information that you only accessed as a Traverse employee for purposes of recruiting business to a competing entity, that's unlawful. So it's just a warning. If this is happening, stop. And in fact, the warning was ignored. What about Katie Musso? Yes, Your Honor. She's the one who admitted that she was, as a Traverse employee, she was using Traverse's information that she only had access to because she was working as a Traverse employee to recruit those patients. Did your client take enforcement action against her? We didn't sue her because we didn't. The answer to my question is no. Correct. Correct. You can explain, but the answer to my question is no, isn't it? The short answer is no, Your Honor. However... Go ahead and explain. We didn't know that that was happening at the time. Secondarily, none of the relevant laws require us to sue every potential defendant after the trade secret violation has already happened to have a prima facie case for earlier events. Were there other former employees of Traverse who went to work for competing organizations? Certainly. And did your client seek enforcement actions against them? No. The short answer is no. And again, the longer explanation is there was no evidence that they had actually been using their Traverse trade secrets access to recruit those people to leave. We don't assume that they won't be able to carry on in their careers. But when we see evidence as we did here with an actual email that we found in August 2023, that is a clear violation and we pursued it. So counsel, what duties in your view does a therapist have to inform a patient, a client, that they're no longer going to be seeing them and that they're moving to a different place? Say they've been treating them for years, it's a therapeutic relationship. Do they have any professional duties to the client that would overcome any potential trade secret? No, Your Honor. And that was exactly the argument made by the defendant in the Trost case, which was even pointed out pre-violation to the defendants in a letter. In Trost, the Washington Court of Appeals rejected that claim and said there was no authority that in that case it was a licensed nurse. There's no authority that this nurse has a right to use trade secrets to notify the patients of her departure. But even going beyond that point, it wasn't as if no one was going to notify these therapy clients of the departure. Traverse, as its declarations explain, as Traverse's 30B6 deponent explained, had a process to make sure that all these therapy clients were properly transitioned. And Katherine Southern's declaration explained that if a therapist says, this person really needs to stay with me individually, she is freely consented to that when it's appropriate for the patient's well-being. So your view is that at least in the light most favorable to you, you had a process in place to handle patient by patient on an individual basis? Yes, Your Honor. That's in the record. Whose decision is it whether to stick with Traverse or go with a therapist who moves to another organization? Well, it's certainly the patient's own decision where to seek any kind of medical care. And do we know from the facts in the record how many of her patients moved with her? Even with the discovery obstruction that we encountered, we did get statements by Ms. Campbell that at least 127 Traverse therapy clients were taken over to Sappler Bridges Wellness Group. Okay. And if she'd taken out an ad in the newspaper that said she had moved, would that implicate trade secrets? No. And in fact, Ms. Campbell testified that out of the 60 therapy clients who she was then seeing at Sappler Bridges, she obtained 15 to 20 through that exact route. The rest were people she had recruited through her email to Traverse patients using Traverse's information. Okay. And I'll just point out that this email that we do have from Ms. Campbell, she testified that Ms. Sadler helped her prepare it, told her what insurance information to include to promote a switch. It wasn't a mere notification. It didn't say, just to let you know, I'm leaving. I'm going to go here. It didn't say that at all. It didn't disclose Sappler Bridges Wellness Group or her destination. It gave essentially promotional information about why this new place is lucrative. And it also diverted the recipients of the email to a non-Traverse email account, which, you know, is in and of itself, especially under the light most favorable to Traverse, the non-moving party, certainly an indicia of misappropriation. One very technical question, which is the opening brief, you've certified compliance with the length limitation and tells us the brief contains 14,003 words. What is your understanding of what the length limitation is under our rules? Oh, it is 14,000 words, Your Honor. I apologize for that. So you've complied, you've certified compliance with something you now acknowledge you didn't comply with and couldn't have lost three words someplace? I apologize for that, Your Honor. Well, be more careful. Did you want to reserve, Counsel? Yes, Your Honor. All right. Thank you. Thank you. Good morning. May it please the Court. I'm Howard Morrell. I represent the appellees, Sadler Bridges Wellness Group, Jamie Boulding Bridges, and Haley Campbell. I don't want to speak long because the record's clear about when things were filed, but it still seems to me that this appeal was untimely filed. Was a judgment entered by the District Court? Not a judgment, but there's plenty of case law that says a voluntary dismissal of the final remaining claim is a final order. It appears to me that that occurred on May 8, 2024. I've got something called judgment in a civil case that appears to have been filed. Yes, Your Honor. I agree. So my question was, was a judgment filed in this case, and I didn't hear the answer yet. Yes, Your Honor, it was. Okay. If you measure from the judgment... It would be timely. I bring it up because that's the way I saw it. I've seen attorneys criticized by this circuit for not raising it if they see it. If I'm wrong, I'm wrong. I'm prepared to address the merits. Do you agree that under Washington state law, whether something is in fact a trade secret or not is a question of fact? It would be if there was evidence to meet the prima facie showing that a trade secret plaintiff has to make. And in this case, there was an utter failure to do that, and that was really the basis of the trial court's ruling. That, in fact, and I quote her, Traverse puts forth no evidence to suggest the patient list constitutes a trade secret. Rather, Traverse conflates the mere existence of a patient list that it is legally required to keep confidential per HIPAA with a trade secret. Contrary to the statement of counsel, the court did not find that persons or firms are stripped of trade secret protection in HIPAA information. It simply found that this information may well be protected by HIPAA, but it is not a trade secret because there's no evidence that it's a trade secret. What's it take to make it evident that a professional customarily doesn't publicize to its relationships, its business relationships or worth? What does it take to say what it is worth? Well, one of the simplest ways to show that would be effort and expense in developing the information. Here the information was entirely to the contrary. There was simply the only analogy I can draw is the chopping wood. We can take the wood and create a stack of wood. And here we have Traverse saying that's a trade secret. It did nothing but accept information that came from clients or and I think this is the significant thing. Or a significant thing. Came from the therapist themselves. The therapist got contacted all the time with this information. It was common apparently. These were clients of Traverse. Yes. Traverse testified the clients don't belong to Traverse. But who did they pay? They paid Traverse. And the conflict of interest policy prohibits using proprietary and or confidential information for personal gain or to the company's detriment. That is certainly what it says. Okay. And losing clients was certainly to the company's detriment, right? It would be. Okay. And among other things, one of these key emails was sent out from the company's email, right? Correct. So the use the company's resource to let hundreds of people know I'm leaving. Come follow me if you want. That's one construction. There's also a construction as your honor raised the issue of having to actually let your clients know that you are leaving. Your duty to do that. But it came on a company email.  It said if you would like to follow me to the new practice, please provide your contact information to my Gmail account. Correct. And the fact of the matter is that is the thing that brought us here. It is this email. What was missing prior to the email or any other contact with clients was any treatment of the material as a trade secret. Confidential does not equal trade secret. It has an economic value. It's pretty self-evident. It has economic value. And so I'm having my previous question. What's it take to make a prima facie case? Doesn't seem to be it takes very much. You're saying summary judgment is appropriate because they didn't make a prima facie case. And I'm trying to figure out, well, what more has to be shown to reach the low level required to satisfy that obligation? And I don't know what's missing. Well, I think there's actually quite a bit of development of the case law into how low a level that is. But I think we have the basic problem here is it reached no level. There was no evidence offered. You can't just say you have to offer evidence of the value and say, and it simply exists because it's a client list. I mean, that's essentially what Traverse's position is. It's a client list, so it has economic value. Well, then there's a whole lot of case law that doesn't make any sense. Talk about showing the effort and expense to develop the information. The fact of the matter is this was confidential information under HIPAA. It was. The client's Traverse agrees it doesn't control. They're not Traverse's clients or they're not Traverse's clients exclusively. These are a bunch of therapists who have professional relationships with these clients. This was not a lawsuit brought for violation of the confidentiality provision. It was a lawsuit brought for violation of trade secret law. And there has to be a prima facie showing of a trade secret before you can get there. So it was a question of law because nothing had been done to show that. Further, there are independent bases for affirming the trial court in the record. The fact of the matter is this wasn't ever treated as a trade secret. Not ever. The case stuff, yes, it was available. This information was available on a secure database. There's also uncontroverted evidence. It was available all over the personal devices of the therapists. All over. There's voluminous showing of examples of that, that this information was available to them. To whom? To all these therapists. All of whom were working for Traverse? All of whom were working for Traverse. I'm going to start a practice as a therapist here. Why don't you tell me who all you service and who all you receive payments from so I can go try to mine that for myself. Now, would you expect Traverse to hand over that list? I would not for a number of reasons, including HIPAA. But the fact of the matter is the fact they wouldn't hand over the list ignores the fact they did hand over the list to people who were working for Traverse. They, well, no, the clients contacted these therapists. Traverse didn't supply these clients. So client A knew how to contact therapist B. But client A would not have known how to contact 50 other clients. Well, the 50 clients, I think there's a difference. I mean, one client wouldn't have access to who other clients were. No, no, no, no. And Mr. Boulding Bridges testified that all of this was confidential. You've conceded that. And he testified that none of the therapists, or at least he didn't have any access to it, without using a password. Mr. Boulding Bridges, I... I'm looking at ER 591. Was there any client information at Traverse that you had access to that did not require a password to get into? Answer, no. Correct. At Traverse. And we agreed the information was at Traverse. We also have uncontroverted testimony that because Traverse encouraged the use of personal devices, wouldn't supply personal devices to therapists, that they encouraged establishment of Zoom contacts, and that these therapists had all of this information through other alternative sources. And Ms. Campbell, by the way, testified that she thought she was doing the upstanding thing by contacting them through Traverse rather than doing it as some kind of seemingly underhanded move outside of Traverse. By using the Traverse email and telling the clients to contact her at Gmail. Correct. By saying, look, I'm not cutting Traverse out... And she copied her boss on that email? I don't believe so. No. But that said... So exactly how is she letting Traverse know that I'm trying to carry away these patients? I don't think she was letting Traverse know that, but she also wasn't going to cut Traverse out of the communication. These clients could reach Traverse, it came on a Traverse email. I think the... but I think the basic point is this. There is summary judgment case law all over trade secrets when a purported trade secret holder doesn't treat the information as a trade secret, doesn't collect it at termination of employment, doesn't have policies in place to say what happens to the information, doesn't treat the information jealously at all. The fact of the matter is all this stuff about Mr. Spurgeon's letters to the clients, to my clients, was after the deeds were done. No prior communication made anything clear that there was a trade secret issue involved here. There were ethical duties to the clients. There were not trade secrets communications, and we know that they know that because they testified that the policy statements they rely on weren't clear. In fact, they supplanted them with a trade secrets agreement, a specific trade secrets agreement, one that uses the term trade secrets and talks about collecting the information after you leave Traverse. Well, because they closed the barn door after the horses were gone, that takes us essentially nowhere, does it? Oh, I think it takes us everywhere, Your Honor. The fact of the matter is you jealously guard trade secret information or you lose it. That has been found on summary judgment by multiple courts, and we do cite some of that case law. There's additional case law that says you treat it as a trade secret or you lose it, and you can be found on summary judgment to have lost the protection because you didn't safeguard it. They didn't safeguard it. They never safeguarded it. My clients were shocked to hear that this was somehow being claimed to be trade secret information. In fact, two of my clients left Traverse without any sort of fault at all and were simply allowed to do so when there was a friendly, amicable parting. What happened here is really pretty simple. It's maybe just background to the issue, but what happened here is pretty simple. Traverse started hemorrhaging therapists, and the therapists in many cases wanted to go work for my clients. And it is the proverbial case of locking the barn door after the horse has bolted. Suddenly, a newly discovered theory of trade secret protection comes up for the first time in any discussion of anyone. It is a little late after the fact. My clients weren't sued for breaches of confidentiality. They were sued for trade secrets violations. That was a specific claim. If they violated some confidentiality provision, let's just say no claim was brought on account of that. It was a trade secrets claim. It was presented as a trade secrets claim. Trade secrets claims have some actual requirements connected with them, and the legislature could have made the statute much simpler if all it wanted to say is, well, you know, if it's a client list, it's a trade secret. They didn't. They said, you have to show it has independent economic value on account of its secrecy. No effort was made to show that. The trial court found none, none whatsoever. No effort was made to say how the information was developed, how it was curated, what was done with it, whether it was even used. It was simply information frequently that came from my clients first, and I will say their statements in the record that there are statements that counsel makes that this was only available via a secure database. Well, it's just not true. Most of the clients on psychology today, well, they all contact the therapist first and directly. Traverse could have said, you know what, that information you're getting, we're paying for that. We want you to transfer it to us and delete it from your servers, from your systems. No, nothing, nothing whatsoever. And just that failure has resulted in summary judgment against trade secrets claimants. That is a complete abandonment of secrecy. And once secrecy is lost, it's lost. It was too late to write and say, now we want it to be trade secrets. All right, thank you, counsel. Thank you, Your Honor. Very brief closing statement, Your Honor. On page 58 of the opening brief, I've included some sites for the proposition that compilations can, in fact, be trade secrets, including the United States v. NOSL, 844 F3rd 1024 at page 1042. There's also, on the Washington side, the Ed Nowagoroski case that has a very simple test for when compilations of customer lists or trade secrets, Traverse satisfied all of those elements, not only looking at it in the Rule 56 context of summary judgment, but also just overall, Traverse's evidence on these points is uncontroverted. And we hear factual assertions that Traverse never protected anything and all of this other criticism, but the record itself doesn't support those factual assertions. In fact, I'll also point to page 65 of the opening brief where Mr. Boulding Bridges admitted that he didn't know any of these therapy patients until he was working for Traverse and received these assignments through Traverse. So any argument that these were people who any of the defendants had a prior professional relationship is incorrect per the record. And the subjective rationalizations that a party would offer after the fact, those are not criteria under the statutes or the recognized case law. And unless the court has any further questions, that's all I have for today. Thank you. We thank counsel for their arguments. The case just argued is submitted and with that we are adjourned for the day. Thank you, Your Honor. And again, I apologize for the word count.
judges: HAWKINS, CLIFTON, BENNETT